IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROLAND MORENO, Individually and | § | |
| RHONDA WHITE, Individually, and as | § | |
| Mother and Next Friend of M.M., a | § | |
| Minor and ROLAND MORENO as | § | |
| Representative of the Estate of | § | |
| MARSHALL MORENO, | § | |
| Deceased, and RITA MORENO, | § | |
| Individually | § | |
| *Plaintiffs* | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 3:13-CV-04106-B |
| | § | |
| CITY OF DALLAS, ALBERT SANCHEZ | § | |
| JEFFREY DEBEVEC, RYAN HALES, | § | |
| FRANCISCO NEVAREZ | § | |
| & UNKNOWN JOHN DOE DALLAS | § | |
| POLICE OFFICERS | § | |
| *Defendants* | § | |

## PLAINTFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE NOTHERN DISTRICT JUDGE:

COMES NOW, Rita Moreno, Individually, who brings this action pursuant to 42 U.S.C.

§1983 and 28 U.S.C. §§ 1331 and 1343, inclusive of 1343(a)(3) and 1343(a)(4), to vindicate her

rights and the rights of her son, Marshall Moreno, as guaranteed by the 4th and 14th

Amendments of the Constitution, also to recover for the intentional infliction of emotional

distress, and files this Second Amended Complaint, complaining of the City of Dallas and Albert

Sanchez, with respect to their Constitutional violations, and Jeffrey Debevec, Ryan Hales,

Francisco Nevarez, and additional Unknown John Doe Police Officers, with respect to both their

Constitutional violations and for intentional infliction of emotional distress, and respectfully

would show the Court as follows:

## INTRODUCTORY STATEMENT

1.      This action is brought by Plaintiff, Rita Moreno, individually, mother of Marshall Moreno. Marshall Moreno was killed as a result of the excessive unnecessary physical force and assault by officers of the Dallas Police Department.

## JURISDICTION AND VENUE

2.      Jurisdiction of this case is invoked under 28 U.S.C. § 1331 because it involves an action arising under the Constitution, laws or treaties of the United States.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims over which this Court has original jurisdiction under Article III of the United States Constitution.

4.      Venue is proper in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391(b). All or a substantial part of the events giving rise to Plaintiff's claims occurred in Dallas, Texas.

## PARTIES

5.      Plaintiff, Rita Moreno, individually, is an adult citizen of Dallas County, State of Texas.

6.      Defendants are:

   A.    **City of Dallas** – a municipal government organized and existing under the laws of the State of Texas. Service of process may be delivered to Mr. Mike Rawlins, Mayor, at 1500 Marilla St. Room 5EN, Dallas, Texas 75201.

   B.    **Albert Sanchez** – is already a party to this proceeding and was one of the Dallas police officers involved in the incident that is the subject of this lawsuit and may be served with process at his place of employment 1400 S. Lamar St. Dallas, TX 75215.

C.    **Jeffrey Debevec** – was one of the Dallas police officers involved in the incident that is the subject of this lawsuit and may be served with process at his place of employment 1400 S. Lamar St. Dallas, TX 75215.

D.    **Ryan Hales** – was one of the Dallas police officers involved in the incident that is the subject of this lawsuit and may be served with process at his place of employment 1400 S. Lamar St. Dallas, TX 75215.

E.    **Francisco Nevarez** – was one of the Dallas police officers involved in the incident that is the subject of this lawsuit and may be served with process at his place of employment 1400 S. Lamar St. Dallas, TX 75215.

F.    **Unknown John Doe Dallas Police Officers** – Plaintiff anticipates the identity and location for service of additional unknown Dallas Police Officers through the discovery process.

## **FACTS**

7.    On or about October 9, 2012, Plaintiff was driving her son, Marshall Moreno, to the Timberlawn Hospital when she pulled into the Circle K gas station and convenience store located at 5527 E. R.L. Thornton Freeway Dallas, Texas 75223.  After pumping gas, she went into the store and asked the cashier to please call 9-1-1 for an ambulance to transport her son to the hospital because she was worried about getting him there safely—Mr. Moreno had a history of mental illness and was acting paranoid. The cashier told Plaintiff that they had an officer at the store, Officer Albert Sanchez ("Sanchez") of the Dallas Police Department. Plaintiff did not request the assistance of a police officer and instead was asking for an ambulance. Sanchez overheard this exchange.

8.      Sanchez then walked out to Plaintiff's mini-van and without probable cause demanded that Mr. Moreno get out of the van with his arms behind his back. Mr. Moreno stated that he had done nothing wrong and asked why he was being arrested. Sanchez repeated his demand. Mr. Moreno then exited the car in a calm manner. Sanchez then asked Mr. Moreno to put his hands behind his back and reached for his handcuffs. Sanchez continued to order Mr. Moreno to put his hands behind his back.  Confused as to why he was being arrested, Mr. Moreno started backing away from Sanchez.  Sanchez then tried to close the distance between himself and Mr. Moreno while holding his handcuffs in plain view. Mr. Moreno then ran from Sanchez.

9.      Sanchez chased Mr. Moreno from the Circle K property, across Winslow Avenue, and through the parking lot of a Shell service station across the street. Sanchez tackled Mr. Moreno and a struggle ensued.   With the assistance of an unknown onlooker, who weighed approximately 250 lbs. and was enlisted by Sanchez to lay on Mr. Moreno, Sanchez continued to struggle with Mr. Moreno. Additional officers of the Dallas Police Department began to arrive to the area. These officers included Jeffrey Debevec, Ryan Hales, and Francisco Nevarez and other unknown officers (hereinafter collectively referred to as "unknown John Doe Officers", "John Doe Defendants" or "John Doe Dallas Police Officers"). Although Mr. Moreno was already defenseless, the unknown John Doe Officers jumped on top of him, beat and kicked him, bound his feet together, and at least one officer sprayed Mr. Moreno with pepper spray. Mr. Moreno was then transported to Baylor Hospital where he was pronounced dead.

10.     Plaintiff watched, unable to do anything, as these John Doe Defendants and Sanchez relentlessly beat, kicked, maced, and ultimately killed her son right in front of her.

11.     Plaintiff witnessed the assault and an excessive use of force as a result of Defendants' abuse of power. Plaintiff was also deprived of her son, who was living with her at the time, as a result of the acts of the unknown John Doe Defendants' excessive use of force.

## CITY OF DALLAS

12.     The City of Dallas employs the City Council form of government and has delegated to the Chief of Police the authority over the Dallas Police Department, including the authority to hire, fire, discipline employees, and implement policies and procedures for the daily and long-term operations of the Police Department. For these purposes, the Chief of Police for the Dallas Police Department is the policy maker. Alternatively, the final policymaker would be the Dallas City Council and/or Dallas City Mayor. But, only the Chief of Police appears to be making the policy decisions shaping the pattern and custom of Constitutional violations through the excessive use of force as set forth below.

13.     The Dallas Police Department has committed a series of constitutional violations over the past several years. In isolation, some of these events viewed could conceivably be argued away as the acts of a rogue officer. But the pattern of these acts indicates a custom of the Dallas Police Department that encourages officers to act with any amount of force they choose, without any regard for the Constitutional rights of the person they are attempting to detain and demonstrates a system by which these acts are concealed. Among these egregious acts are the following:

   a.     In 2008, Lavell Fairbanks, an unarmed man, was repeatedly beaten by Dallas Police Officers with a flashlight. Part of his skull had to be removed as a result of this assault. See Exhibit A.

   b.     On September 5, 2010, three Dallas police officers pursued Andrew Collins in a chase. When they caught up to him, they violently beat him up. See Exhibit B.

c.   In October 2010, Tobias Mackey was shot nine times by a Dallas police officer when he was told to put his hands up, but refused and instead reached in his pockets. One of the shots fired also hit an 11-year old child in the arm. See Exhibit C.

d.   On January 28, 2011, after Rodarick Lyles was handcuffed and lying on the ground, a Dallas police officer maced him in the face and kicked him in the face. This appears to be the only incident where another officer came forward and spoke out about this excessive use of force. See Exhibit A. On Jan. 24, 2011, Dallas Police Chief David Brown responded to the excessive force used against Rodarick Lyles in a news conference, saying "With this action today, we stand firm in our belief that the integrity of the DPD stands above the actions of a single officer or group or association," and, "We also ask the public to view our actions as proof that we can and will police ourselves."

e.   On June 2, 2012, a Dallas police officer pulled over John Husband on a minor traffic violation, asked him to step out of the car, and began to handcuff him. When John Husband began to run, the Dallas police officer shot him in the back and killed him. A gun was later found on John Husband's person, but there does not appear to be any indication that the fleeing man brandished the weapon. See Exhibit D.

f.   On July 24, 2012, Dallas police officers pursued four fleeing suspects; one of them was James Harper. The officer who was pursuing James Harper eventually caught up with him. They struggled, and James Harper broke free and began to flee again. The officer caught up to him again and further struggle ensued. At this point, the officer became fatigued and felt he was losing control. Instead of allowing James Harper to continue to flee, the officer—who claimed he feared for his life—shot James Harper

three times, killing the young man. See Exhibit E.

g.     In response to the numerous shootings occurring in 2012 and the riot that nearly ensued after the killing of James Harper, the Dallas Chief of Police instituted new policies and directives, but none of them addressed training officers on use of force. See Exhibit F.

h.     The policies and directives were:

    1)  Formalize a process of concurrent investigative review with the FBI Civil Rights Office of all officer involved shootings;

    2)  Implement a more comprehensive Response to Resistance reporting system;

    3)  Develop a foot pursuit policy to enhance officer safety;

    4)  Re-implement the Digital Video Recorder (DVR) Review Team;

    5)  Implement a mandatory electronic control weapon (Taser) training policy for all officers;

    6)  Enhance the Department's consensual search policy to include the requirement for a written and/or recorded consent;

    7)  Research best practices that have come from critical incidents or institutional failures in public safety from around the nation; and

    8)  Assemble a special Community Policing Strategic Team of officers for the Dixon Circle community.

i.     Until the implementation of these procedures in 2012, the Dallas Police Department had no comprehensive system for tracking the officer's use of force. Whether a more comprehensive procedure for tracking response to resistance was ever implemented and whether it was effective are unknown at this time. More importantly, none of

these policies or directives created any semblance of a solution to the persistent problem of officers using excessive force. See Exhibit F.

14.    The excessive use of force, and the lack of any action by the City of Dallas to correct this, is evidenced by these events and others. The failure to implement any training initiatives to curb the excessive use of force or otherwise address the problem has created a custom whereby officers feel free to use any amount of force they feel like using.

15.    If irrefutable evidence that excessive use of force was used does come to light, the officer is usually fired, although it is not uncommon to see the officer reinstated after they are cleared of the charges. There is a lack of proper training or education on excessive use of force. These customs and culture have perpetuated what some have termed a "blue wall of silence," where officers tend towards covering up the actions of other officers. This culture still continues and was evidenced by the initial reports issued in the shooting of Bobby Gerald Bennett.

   a.    On October 14, 2013, Officer Cardan Spencer shot Bobby Gerald Bennett, the initial reports said the officer had good cause to fire his weapon, but later a video from a neighbor's security camera surfaced to show that shooting was not with cause and excessive force was used. The officer was indicted for shooting the suspect in 2014. See Exhibit G.

   b.    Also, on December 9, 2013, Officer Amy Wilburn shot Kelvion Walker, a passenger in a carjacking vehicle. The officer claimed to have made a split second decision based on alleged fear of danger. According to a witness he had his hands up when, as the video footage shows, she drew her gun from the holster and fired. The officer was indicted for shooting Mr. Walker in 2014. See Exhibit H.

16.    Despite this lengthy and clear pattern of excessive use of force, it was not until this year

that the Dallas Chief of Police began to discuss in any amount of detail his *plan* to increase the use of deadly force training. There is no indication this plan has been implemented or that it has had any effect. The policies of the Dallas Police Department continue to insulate police officers and perpetuate a culture where excessive use of force is condoned. See Exhibit I.

17.     Under the current policy, the Dallas police officers have 72 hours before they are required to make an official sworn statement about what happened. During this time they have unbridled access to investigative evidence related to the officer-involved killing. This allows them to interrogate witnesses and cover up any excessive use of force. Indeed, it is not uncommon for witnesses to be treated like criminals, such as being detained for hours and brought to an interrogation room for questioning by the team investigating the killing. See Exhibit J.

18.     Only in the most egregious and obvious cases, often where there is incontrovertible video evidence or where another officer openly testifies to the excessive use of force, will excessive use of force be found. The last case where an officer openly stated that another officer used excessive force appears to be the case of Roderick Lyles in 2011. This unfortunately appears to be an exception rather than the norm.

19.     In 2013, the Dallas County District Attorney expressed his concern in this area and stated his desire to have an independent team of investigators sent to the scene of police shootings moments after the occurrence, instead of relying on police reports and Dallas police investigators. The Dallas Police Association President, Ron Pinkson, has already stated his strong opposition to this plan. See Exhibit K.

20.     As demonstrated by this pattern of excessive use of force, the City of Dallas has permitted and tacitly encouraged the excessive use of force by Dallas police through its acts or omissions. These acts or omissions include, but are not limited to:

      a.   failing to adequately train Dallas police to prevent the occurrence of misconduct;

      b.   failing to adequately supervise Dallas police to prevent the occurrence of misconduct;

      c.   failing to adequately monitor Dallas police who engage in or who may be likely to engage in misconduct;

      d.   failing to adequately investigate incidents in which a police officer uses lethal or non-lethal force;

      e.   failing to fairly and adequately adjudicate or review citizen complaints, and incidents in which a police officer uses lethal or non-lethal force; and

      f.   failing to adequately discipline Dallas police who engage in misconduct.

21.     These acts and omissions of policy, custom, training, and discipline are the driving force behind Defendants' constitutional violations. But for these acts and omissions, Plaintiff's injury would not have occurred.

## GENERAL ALLEGATIONS - 42 U.S.C. § 1983

22.     Plaintiff incorporates all allegations set forth in previous paragraphs as fully set forth herein.

23.     During this incident, Defendants Unknown John Doe Dallas Police Officers and Albert Sanchez used unreasonable and excessive force to effectuate the detention and seizure of Mr. Moreno. Defendants Unknown John Doe Dallas Police Officers and Albert Sanchez were aware that repeatedly beating, kicking, and otherwise assaulting a defenseless man, already in restraints,

could cause serious bodily injuries, pain, suffering, and death. Defendants Unknown John Doe Officers and Albert Sanchez's poor conduct was excessive, objectively unreasonable, and directly resulted in Mr. Moreno's injuries and death.

24.     The City of Dallas is also responsible for this incident. As the facts set out, the custom and practice of the City of Dallas encourages and ratifies the use of excessive force. The City was aware that officers would likely encounter similar situations and citizens would be placed in danger when excessive force was used. Despite this awareness, the City took no steps to adequately train officers on the appropriate use of force or supervise and monitor the excessive use of force by Dallas police. As a result there was and still is a widespread practice in the Dallas Police Department to use whatever amount of force the officer chooses to use. These practices and lack of training are so common as to constitute a custom that fairly represents a policy of the City of Dallas.

25.     The implementation of the above practices, failure to implement and enforce written policies, and the lack of adequate training by the City constitutes deliberate indifference to Mr. Moreno and Plaintiff. Further, these were the moving force and direct cause of their injuries.

26.     As indicated by the facts, Defendants were acting under color of state law in the deprivation of Mr. Moreno and Plaintiff's constitutional rights.

27.     The above described actions of the Defendants subjected Mr. Moreno and Plaintiff to deprivation of the rights, privileges and immunities secured to them by the Constitution and the laws of the United States of America, including the due process clause of the Fourteenth Amendment to the United States Constitution within the meaning of 42 U.S.C. § 1983, and an absolute right to be free from unreasonable seizure/arrest without probable cause provided by the Fourth Amendment, as incorporated to the states by the Fourteenth Amendment.

**ADDITIONAL CAUSE OF ACTION ONLY AGAINST DEFENDANTS UNKNOWN**
**JOHN DOE DALLAS POLICE OFFICERS –**
**INTENTION INFLICTION OF EMOTIONAL DISTRESS**

28.     Plaintiff incorporates all allegations set forth in previous paragraphs as fully set forth herein.

29.     This action is brought to recover those damages as provided by law for injuries and damages suffered by Plaintiff due to Defendants Unknown John Doe Dallas Police Officers intentional infliction of emotional distress on Plaintiff.  In this case, while Mr. Moreno was already handcuffed, unknown John Doe Officers beat and kicked him, bound his feet together, and sprayed him with pepper spray. Their conduct was extreme and outrageous primarily for two reasons: (1) Mr. Moreno had committed no crime, and (2) these acts were committed while Mr. Moreno was incapacitated in handcuffs and defenseless.

30.     These officers may have initially been responding in their capacity as police officers, but the facts indicate that they ceased acting as police officers when they continued to beat and violently attack an incapacitated man, at this point they were nothing more than a mob of vigilantes.

31.     While these actions were encouraged and tolerated by the culture of the Dallas Police Department, these officers were no longer employees when they crossed the line of using excessive force to detain a man and started using excessive force for either their own perverted amusement, to seek retribution, or to punish Mr. Moreno. Regardless of their motivation, they each made a choice to set their badge aside and engage in a rampant assault that culminated in the death of Mr. Moreno.

32.     Defendants' actions caused Plaintiff emotional distress because she witnessed the entire incident.  Plaintiff had a clear and unobstructed view of the entire series of events culminating in

the death of her son.  The emotional distress suffered by Plaintiff was severe because she witnessed her son being beat to death, a horrific event that no reasonable person should be subjected to endure.

## EXEMPLARY AND/OR PUNITIVE DAMAGES

33.    Plaintiff incorporates all allegations set forth in previous paragraphs as fully set forth herein.

34.    The conduct of Defendants was done willfully, recklessly, wantonly, maliciously, and/or intentionally. This conduct was so flagrant as to offend a public's sense of justice and propriety. Accordingly, Plaintiff is entitled to recover exemplary and punitive damages in an amount determined by the jury that is sufficient to punish Defendants, to serve as an example to others, and as a deterrent of future conduct.

## ACTUAL AND COMPENSATORY DAMAGES

35.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

36.    Plaintiff has suffered out-of-pocket expenses, which include travel expenses, attorney's fees, loss of the income her son contributed to her household, and other expenses. Accordingly, Plaintiff seeks all general, special, incidental, and consequential damages as shall be proven at the time of trial, including exemplary and enhanced damages, pre-judgment interest, and post-judgment interest.

37.    The amount of total damages suffered by Plaintiff is significant and continuing in nature. Such amounts exceed the minimum jurisdictional limits of this Court. Plaintiff reserves the right to amend and state further with respect to their damages.

## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

38.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

39.     Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, a statutory rate of interest because of the delay in receiving the damages and also to avoid unjust enrichment to Defendants. Plaintiff also seeks post-judgment interest at the maximum rate allowed by law.

## DEMAND FOR JURY TRIAL

40.     Plaintiff demands a trial by jury for all the issues so triable.

## DEMAND FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that the Defendants be cited to appear and answer and that upon final hearing, Plaintiff has judgment of and from the Defendants, jointly and severally for:

(a) equitable relief;

(b) past and future pain and suffering;

(c) past and future mental anguish;

(d) actual, incidental, and consequential damages;

(e) reasonable attorney fees;

(f) costs of court;

(g) punitive and exemplary damages in an amount above the minimum jurisdictional limits of this court;

(h) pre-judgment interest at the maximum legal rate for all damages suffered;

(i) post-judgment interest at the maximum legal rate for all damages suffered; and

(j) for such other and further relief, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

Law Office of William Chu


By:     /s/ William Chu                          
        William Chu
Texas Bar No.:  04241000
4455 LBJ Freeway, Suite 909
Dallas, TX 75244
Telephone: (972) 392-9888
Fax: (972) 392-9889
wmchulaw@aol.com
Attorney for Plaintiff

# EXHIBIT A

 CHALLENGE US
TO PROVIDE





Powered by *The Dallas Morning News*

ALL COMMUNITIES     LOCAL NEWS     WEATHER

## Dallas set to pay nearly $1M to settle police brutality cases

☒        9          6          0      ⦿ Share  0      1    AA ▲ ▼

By ROBERT WILONSKY and STEVE THOMPSON
Staff Writers
Published: 04 June 2012 10:43 PM
Updated: 05 June 2012 12:33 AM

The Dallas City Council will vote soon on whether to spend nearly $1 million to settle two police brutality cases.

Both cases involved police officers accused of beating men who were already subdued and defenseless.

On Jan. 28, 2011, as a handcuffed Rodarick Lyles lay defenseless and face down on the ground, a Dallas police officer kicked him in the head and used pepper spray on him. It was captured on dash-cam video.

Officer Quaitemes Williams, responsible for the assault, was arrested on a charge of official oppression, with Dallas Police Chief David Brown insisting at a news conference in February 2011 that "it won't be tolerated, and it will be met with both termination and criminal charges if appropriate."

The other case involves Lavell Fairbanks, who in October 2008 called 911. He told police he and his girlfriend were having an argument; he acknowledged he'd been drinking, which is why, he said, he took off running when officers arrived at his doorstep. He would later claim, though, that he decided to surrender to officers — who, witnesses said at the time, beat Fairbanks repeatedly with a flashlight, resulting in part of his skull being removed.

The civil case filed by Fairbanks to recover damages from the city was scheduled to go to trial last week for a second time. An initial trial in January resulted in a hung jury.

But Mike Skinner, Fairbanks' attorney, said that he received a call from the city attorney's office a month ago about settling; an agreement was reached two weeks ago.

"I am happy for Mr. Fairbanks to get some compensation. His injuries were substantial, and he could have recovered more" had the case gone to trial again, Skinner said.

"But we had our challenges in the case, such as jurors want to give officers the benefit of the doubt. It's like many settlements in that it's a compromise," Skinner said.

A week from Wednesday, in separate votes, the council will decide whether to settle with Lyles for $500,000 and Fairbanks for $450,000.

Last month, the city settled with motorcyclist Andrew Collins, who'd filed a civil rights suit against police officers for beating him after a September 2010 chase. The city paid $500,000.

sthompson@dallasnews.com; rwilonsky@dallasnews.com

Did you see something wrong in this story, or something missing? Let us know.

You Might Also Like






Casey Kasem Found; Judge Orders Hearing on His Health (AARP)

25 Celebrities Who Show Too Much On Red Carpet (Styleblazer)

15 Pics Beyonce Doesn't Want You To See (Bossip)

Obama's Bergdahl Deal May Be Smarter Than You Think (The Fiscal Times)

Recommended by

### From the web

10 Things You Didn't Know About Julianne Hough Celebrity Gossip Answers

Most RIDICULOUS Prom Dresses Of 2014 Bossip

This Bride Tied Her Newborn Baby to Her Wedding Dress and Dragged Her Down the Aisle E! Online

### More from *Dallasnews.com*

How unique analytics theory might benefit Rangers' strapped rotation Sports

Magnificent Yu Darvish helps Rangers salvage series Sports

Transferred Dallas police academy employee alleges internal affairs tried to change, influence his answers News

Recommended by

## Comments

To post a comment, log into your chosen social network and then add your comment below. Your comments are subject to our Terms of Service and the privacy policy and terms of service of your social network. If you do not want to comment with a social network, please consider writing a letter to the editor.

> Write a comment

**1 Comment**          Sort   Subscribe   RSS

**Daryl Humphrey**        54 days ago

That's what i call "justice".

Reply   Share        0     0

EXHIBIT B

# Cops indicted in Texas taped beating - CNN.com

*By Matt Smith , CNN*
*September 30, 2010 7:56 p.m. EDT*

CNN.com



*Patrol car dashboard cameras recorded what happened after the police pursuit of motorcyclist Andrew Collins ended.*

**(CNN)** -- A grand jury has brought felony charges against three Dallas, Texas, police officers who were caught on patrol car dashboard cameras beating a motorcyclist after a chase, prosecutors said Thursday.

Officers Paul Bauer and Kevin Randolph were charged with aggravated assault with a deadly weapon by a public servant, a charge that carries a five-year minimum prison term,

in the September 5 beating of motorcyclist Andrew Collins. A third officer, Henry Duetsch, was charged with third-degree felony of tampering with physical evidence, said Jamille Bradfield, a spokeswoman for the Dallas County district attorney's office.

Bauer was also charged with assault and with official oppression, both misdemeanors. Randolph -- who was fired for failing probation after the incident -- was charged with official oppression and tampering with a governmental record, another felony.

There was no immediate response to the charges from the three defendants.

Prosecutors say Bauer and Randolph spotted Collins sitting on his motorcycle on a sidewalk the night of September 5. He drove off when the officers shined a spotlight on him, and they began pursuing him. An internal investigation found that Bauer and Randolph disregarded an order to stop the chase, with one of the officers saying, "Keep us going. I'm going to kick the s--- out of him."

Collins eventually stopped, and when the officers spotted him, Bauer struck the bike with his patrol car. Randolph beat Collins with his baton after Collins dropped to all fours, and Bauer began hitting and kicking him, police said. And Duetsch, who arrived on the scene after Collins had stopped, turned another cruiser's dashboard camera away from the scene when he arrived.

Three other officers were put on restricted duty after the beating. They were seen on the second video also having contact with Collins, but they are not clearly seen because Duetsch had turned the camera away from the beating, Dallas Police Chief David Brown said earlier this month.

In a statement issued after the indictments, Brown said the charges are "another step in the process of bringing this incident to a conclusion."

Case 3:13-cv-04106-B   Document 66   Filed 11/03/14   Page 21 of 58   PageID 711

"As chief of police, I will ensure that every citizen of this city is treated with a deserved measure of respect by our officers," he said.

Collins suffered bruises in the incident, developed blood clots and complained of pain. He initially was charged with three traffic warrants, evading arrest, resisting arrest, and possession of marijuana after his arrest. After seeing the video, police dropped the resisting arrest charge.



© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

# EXHIBIT C

- 
- 
- **My Profile**
- **Sign Out**



DALLAS/ FORT WORTH | WFAA-TV

AdChoices ▷

# Dallas police reopen investigation into 2010 shooting of unarmed man

by REBECCA LOPEZ

Bio | Email | Follow: @rlopezwfaa

WFAA

Posted on March 20, 2014 at 11:14 PM

DALLAS -- Tobias Mackey hadn't committed a crime, or done anything wrong, all he was doing was walking in a Dallas apartment complex in October of 2010.

Then, he came in contact with former Dallas police Officer Matthew Tate.

"When he did that shooting, I was standing two feet away from Tobias," said Sgt. Kenneth Chapin, who was standing next to Tate.

Sgt. Chapin told internal affairs investigators he was surprised by the gunfire.

"Initially, I was confused where the shots were coming from and drew my weapon because shots were being fired," he said.

Tate fired all nine shots, killing Mackey and shooting 11-year-old Xavion Collins in the arm.

Mackey's mother says her son was killed for no reason.

"I want the whole world to know my son did not die because he was trying to hurt somebody," Shelia Lewis said. "He was unarmed."

In court documents News 8 obtained, officers were at the complex to look for troublemakers. They talked about it on their squad car computers.

One message read, "Going straight to apts. or just grabbin people?"

The reply was, "Anyone that acts dumb or guilty."

Tate and Sgt. Chapin claimed when they saw Mackey, they yelled at him to put his hands up, but he wouldn't comply.

Tate said Mackey looked like he was reaching in his waistband for a weapon, so he shot him.

"I want the truth to be revealed to everyone, because right now, they are saying Tobias' shooting was a justifiable shooting," Lewis said.

Initially, three shots were fired. Witnesses say Mackey shouted "Why did you shoot me? I don't have anything!"

Officer Tate then fired more shots.

The Dallas Police Department, the Dallas County District Attorney's office, and the local FBI cleared the officers. No charges were filed and no discipline was handed out.

So Shelia Lewis began a crusade for justice for her son.

"People don't know -- going up against the Dallas Police Department is not easy," she said.

Lewis sued, the city took a closer look at the case, and offered her hundreds of thousands of dollars, which she turned down. She then went to the U.S. Department of Justice and got them to open a civil rights case.

Three years later, Sgt. Chapin has changed part of his story.

News 8 has learned last month the Dallas Police Department reopened a criminal investigation and internal affairs investigation in the case. Chapin is now under investigation for lying.

And in recent depositions, Chapin told Lewis' attorneys there was no reason for Tate to shoot Tobias Mackey.

If the justice department gets a grand jury to indict Tate, it will be the first time ever a Dallas police officer will have been indicted in the shooting of an unarmed man.

"I am very hopeful," Lewis said. "I am very hopeful justice is here."

The Dallas Police Department and city attorney's Office had no comment.

E-mail **rlopez@wfaa.com**

# EXHIBIT D

- 
- 
- **My Profile**
- **Sign Out**



DALLAS/ FORT WORTH | WFAA-TV

# Anger grows over man shot in back by Dallas police

by JONATHAN BETZ

WFAA

Posted on June 4, 2012 at 5:59 PM

Updated Tuesday, Jun 5 at 4:07 PM

DALLAS - Dallas police say John Husband III, the man who was shot and killed by an officer on Saturday, was reaching for a "fully loaded" handgun when the officer fired in self-defense.

The police statement — issued nearly two full days after the incident in the 3600 block of Folklore Trail in Oak Cliff — said a car driven by Husband was pulled over by Officer Leland Limbaugh for failing to signal a turn.

The officer, hired in 2009, "smelled the odor of marijuana coming from the car" and ordered Husband out of the vehicle. When Limbaugh began to handcuff Husband, the 21 year old tried to break away.

"Suspect Husband ignored the officer's commands and began to struggle with the officer," the statement read, adding Husband then, "reached for the gun in his waistband."

The story contradicts what several witnesses claim, including Xavier Bryant, 22, who was in the car with Husband at the time.

"He didn't even try to chase him," Bryant said. "Then they try to make it seem like he was going for a gun? He was trying to run away."

He and others insist Husband was shot in the back as he ran away. The Dallas County Medical Examiner confirms the bullet struck him in the back, near the left shoulder blade.

Police dashcam video, which would help settle the discrepancies, is not available. Officer Limbaugh's car is one of the few in the fleet not equipped with a video camera.

"That's real messed up," said Derrick Epps, 26, of the revelation that there is no video. He was also in the car with Husband and Bryant as they visited a friend's apartment.

"That was our proof," he said. "He was running away. I promise you."

Husband was pronounced dead a short time later at a nearby hospital.

Police said a "fully loaded .40-caliber handgun" was found with the suspect, along with marijuana.

The department says the officer feared for his life. Ofc. Limbaugh is now on "special assignment."

"If the officer believes he saw him going for a weapon [...] then deadly force was appropriate at that time," said Harvey Hedden, who trains officers internationally.

Hedden noted officers only have a split second to make a decision.

"You are seeing someone grasp for what you believe is a weapon after you told them

Case 3:13-cv-04106-B   Document 66   Filed 11/03/14   Page 28 of 58   PageID 718

they are under arrest," he said. "The only conclusion you can draw is that they want to use that weapon on you — and if you hesitate, you are dead."

The shooting is the sixth time in 2012 someone has been killed by a Dallas police officer, angering community activists like Peter Johnson.

"This is embedded in the culture of the Dallas Police Department," he said. "If you shoot somebody in the back that is running away from you, that is murder!"

Others question why non-lethal force wasn't used instead. Just a few hours earlier that same day, Dallas SWAT officers used a gun that fires bean bags to subdue a non-cooperative, suicidal man in North Dallas.

"So now the question is, bean bags are used up north and bullets are used down south?" said activist Ronald Wright. "It's just unacceptable."

The events have troubled Dallas City Council member Dwaine Caraway, who said he wants more information about what exactly happened on Saturday.

"If indeed this young man was shot in the back while running away, it doesn't take a rocket scientist to know there are some questions that need to be asked," he said. "I'm not happy about it."

Meanwhile, Husband's family is planning his funeral. His father said Husband hoped to eventually become a truck driver to better provide for his long-time girlfriend, Amber Gurley, and their one-year-old son.

"This is wrong how his dad died," Gurley, 19, said. "It's wrong how they took him, and it's wrong that I'm going to be an only parent taking care of him."

E-mail **jbetz@wfaa.com**

EXHIBIT E

- 
- 
- **My Profile**
- **Sign Out**



# Chief: Officer opened fire after fearing for his life

by REBECCA LOPEZ and JASON WHITELY

**Bio** | **Email** | Follow: @jasonwhitely

WFAA

Posted on July 24, 2012 at 5:30 PM

Updated Wednesday, Jul 25 at 3:32 AM

DALLAS -- Gunfire erupted in southeast Dallas late Tuesday afternoon as police confronted four suspects at what neighbors said was an illegal drug house. An officer fatally shot one of the suspects during an extended foot chase.

The tense situation escalated when hundreds of people converged on the crime scene.

Case 3:13-cv-04106-B Document 66 Filed 11/03/14 Page 31 of 58 PageID 721

At a news conference Tuesday night, police Chief David Brown said when three officers surrounded the house in the 5300 block of Borquin Street responding to a 911 kidnapping call, four people ran from the residence from the front door and from windows.

Brown said veteran Officer Brian Rowden began a foot pursuit of 31-year-old James Harper. Brown said the two engaged in three separate "physical fights" as the suspect ran down an alley and hopped over three fences.

"After jumping the third fence after Harper, Officer Rowden was basically out of energy and just clinging to Harper, who was beating on him," Chief Brown said. "Officer Rowden states at this time Harper said, 'You're gonna have to kill me.'"

Chief Brown said the officer, fearing for his life, pulled his weapon and shot Harper in the stomach and the hand. The chief said Harper has a long criminal history.

Brown said no weapon was found on Harper, and that there was no evidence that any of the officers had been fired upon. He said it was not clear why the officer did not use a Taser or other non-lethal weapon to subdue Harper.

Officer Rowden was shaken up but was not seriously hurt, Brown said.

One other suspect surrendered and Brown said police confiscated cash and crack cocaine from the property. While the first officers at the scene said they had seen a handgun on a table inside the residence, no weapon was recovered.

Chief Brown urged any witnesses to come forward with information about what they saw.

The incident triggered emotional outbursts from a number of onlookers.

Sandra Harper, who identified herself as the mother of James Harper, claimed her 31-year-old had been shot in the back. Chief Brown said the medical examiner would make that determination.

"My son didn't have no gun, whatever the police said," Mrs. Harper said.

- **WATCH Sandra Harper's comments**

The crowd was urged to move to a nearby church to attend a community meeting to discuss what happened. Dallas City Council member Dwaine Caraway was at the scene to gather facts.

"This is beyond Southeast, this is the Dallas Police Department and the City of Dallas," Caraway said. "The police are moving and doing what they need to do to clear the

neighborhood so we can bring peace."

Caraway said the victim's family is cooperating. "This is a very volatile situation, and it if not handled right, it could escalate into something that it should not," he said.

- **WATCH Dwaine Caraway's comments**

Rev. Kyev P. Tatum of the Southern Christian Leadership Conference issued this statement:

> "The fair minded people in South Dallas need to remain calm; peaceful and allow justice to take her course. We will make sure a full investigation is conducted and we are confident that Chief Brown and DA Watkins will seek truth in this case. Violence in the community is not the answer. As Dr. King once said, 'An eye for an eye leaves everybody blind.' The SCLC is praying for the peace in South Dallas."

Brown said police responded to the address shortly after 5 p.m. after receiving a 911 call reporting a man being dragged into the house. The chief said it appeared that the report was bogus, and may have been issued by a competing drug dealer.

Dozens of police units -- some in riot gear -- converged on the scene to provide crowd control. The department's SWAT team arrived after 6:30 p.m.

There appeared to be several emotional people and at one point, at least one officer was seen firing what appeared to be pellets into the pavement that left marks on the surface in an effort to disperse the crowd.

Later, several fist fights broke out in the street among onlookers.

A woman was taken away in an ambulance.

News 8 observed at least three top police officials at the scene, including Assistant Chief Charles Cato. Two "companion officers" were requested at the scene to provide assistance to any police personnel who were involved in firing their weapons.

Rev. Earnest Freeney, a pastor in the community, was helping police to try and calm down the crowd. He said he was worried that people from other parts of the city and even from other cities would come to this neighborhood, increasing problems for public officials.

- **WATCH Rev. Freeney's comments**

Chief Brown said the results of a police investigation will presented to the district attorney, who will, in turn, present that evidence to an independent grand jury which

Case 3:13-cv-04106-B   Document 66   Filed 11/03/14   Page 33 of 58   PageID 723

will determine whether the fatal shooting was justified.

# EXHIBIT F



# neighborsgo

Powered by *The Dallas Morning News*

ALL COMMUNITIES    LOCAL NEWS    WEATHER

## Dallas police chief outlines policies in wake of shootings involving police

☑    1    12    0    ８⁺ Share    2    AA ▲ ▼

By SCOTT GOLDSTEIN and TANYA EISERER
Staff Writers
Published: 10 August 2012 11:17 PM
Updated: 11 August 2012 11:48 AM

Dallas Police Chief David Brown on Friday announced what he called new policies and directives in response to a wave this year of 16 shootings involving officers, including eight fatalities and one that nearly set off a riot last month.

The initiatives include requiring written or recorded proof for consensual searches, mandatory Taser training for all officers, a foot pursuit policy and more detailed documentation of cases in which officers fight back against resisting suspects.

At least some of the eight items Brown outlined in a written statement had already existed in some form for years. Some appear to be enhancements of existing practices, though department officials would not specify how, when or what improvements would be made.

It's unclear who, if anyone, Brown consulted in devising his list, which his statement said "will positively impact officer safety and improve public trust and confidence."

Lt. Scott Walton, a department spokesman, refused to answer questions. He said Brown would not be available to talk about the policies until at least Monday evening.

"These are general ideas of future possible policies," said Ron Pinkston, president of the Dallas Police Association. "Some of them we already do. These are generalizations. … They're just looking at things."

The announcement comes weeks after the fatal police shooting in South Dallas of 31-year-old suspected drug dealer James Harper. After a foot chase, Officer Brian Rowden shot Harper during a fight in which Rowden said he saw Harper reaching in his pocket and feared for his life. Harper was found to be unarmed.

The shooting nearly set off a riot that night in the Dixon Circle neighborhood, which has long been plagued by drugs and violence. It was the most recent fatal shooting during a year in which the city is on pace to see the most police-involved shootings in at least a decade, even as the crime rate reportedly continues to fall.

There were 15 officer-involved shootings in 2009, 16 in 2010 and 12 in 2011, according to department statistics.

### The directives

Other policies and directives Brown outlined include:

Formalizing a process in which the FBI Civil Rights Division reviews all officer-involved shootings. The FBI has been called in for select cases.

Reimplement a team to review police in-car camera videos, a step the chief had previously said he planned to take. Brown had temporarily suspended the program amid officer complaints that it was overly focused on minor infractions.

Assign a special community police team to focus on crime and other problems in the Dixon Circle neighborhood, where Harper was shot. Neighborhood police officers throughout the city have had similar goals for years.

Case 3:13-cv-04106-B   Document 66   Filed 11/03/14   Page 36 of 58   PageID 726

Research national best practices related to major incidents and institutional failures, which police officials are already known to do almost daily.

Brown also vowed to revisit one of the darkest periods in department history, following the 1986 fatal police shooting of 70-year-old Etta Collins, who was black, by a white officer. He promised to review recommendations that came out of congressional hearings following that shooting.

Experts and community leaders and activists praised the underlying tenets of Brown's list. Some said that many of the policies ought to have been in place by now.

**Warding off trouble**

Geoffrey Alpert, a University of South Carolina criminologist and an expert on police use of force, said it appears the chief is cognizant of other major city police departments that were placed under federal consent decrees after scandals in recent years.

"He's ramping up all these different tactics to avoid that," Alpert said. "This really sounds like an ambitious update to their accountability system. … A lot of that stuff they should have been doing before."

For example, many other major police departments already have a separate report to document police use of force. Dallas officers currently only document the use of a Taser and pepper balls on special forms. Other types of force are typically documented within an officer's arrest report, which makes it more difficult to track and quantify.

"They were behind the curve on use of force reporting," Alpert said.

Longtime community activist Marvin Crenshaw, who lives in South Dallas, said some have long called for similar steps.

"The central question to me is this: When an officer violates all of those new policies that he's talking about … what will the Police Department do?" Crenshaw said.

**Officers lukewarm**

The response to Brown's announcements among officers was lukewarm.

Dallas Latino Peace Officers Association President George Aranda said that while FBI oversight is called for in some cases, Brown's apparent plan to do so in all shootings "seems redundant and almost questions the validity of our own department's investigative units."

A foot chase policy could restrict officers too severely, Aranda said in an email. Though there is no official policy, officers have been trained on guidelines for foot pursuits for years.

"I hope that these policies are implemented for officer safety and supporting officers and telling the community enough is enough in regards to the criminal element instead of protecting criminals that deserve to be incarcerated," Aranda said.

Pinkston, who represents the largest officers' union, said he was not consulted on the chief's plans.

"There's no meat to it, so why would you have to tell me in advance?" Pinkston said.

The way the communication was handled created confusion for some police officers, Pinkston said.

"You see some officers are already complaining about the new foot pursuit policy. There isn't one," Pinkston said. "I don't understand the strategy of releasing it at 3:30 on Friday."

sgoldstein@dallasnews.com; teiserer@dallasnews.com

Follow Scott Goldstein on Twitter at @dallascrime and Tanya Eiserer at @tanyaeiserer.

Did you see something wrong in this story, or something missing? Let us know.

You Might Also Like

Case 3:13-cv-04106-B   Document 66   Filed 11/03/14   Page 37 of 58   PageID 727






Casey Kasem Found;
Judge Orders Hearing
on His Health
(AARP)

15 Pics Beyonce
Doesn't Want You To
See
(Bossip)

25 Celebrities Who
Show Too Much On
Red Carpet
(Styleblazer)

Obama's Bergdahl Deal
May Be Smarter Than
You Think
(The Fiscal Times)

Recommended by

### From the web

10 Things You Didn't Know About Julianne Hough Celebrity Gossip Answers

This Bride Tied Her Newborn Baby to Her Wedding Dress and Dragged Her Down the Aisle E! Online

Slideshow: 7 Hottest Female Athletes Who Will Give You An Adrenaline Rush Bilibr

### More from *Dallasnews.com*

Key call pushes TCU past Sam Houston State in epic 22-inning, nearly seven-hour game Sports

Agent: Josh Brent hasn't pursued NFL return; Cowboys won't rule out reunion Cowboys Blog

Trial date set for Saginaw teen charged with killing 6-year-old neighbor Crime Blog

Recommended by

### Comments

To post a comment, log into your chosen social network and then add your comment below. Your comments are subject to our Terms of Service and the privacy policy and terms of service of your social network. If you do not want to comment with a social network, please consider writing a letter to the editor.

> Write a comment

**0 Comments**          Sort   Subscribe   RSS


PRINT THIS
Powered by  Limelight

HOME > NEWS > LOCAL

# Dallas Police Release Synopsis of James Harper Shooting

Friday, Aug 10, 2012 | Updated 4:07 PM CDT



The Dallas Police Department released a synopsis
of their investigation into the shooting death of

James Harper by Officer Brian Rowden.

The complete synopsis is included below:

*"On July 24, 2012 at about 4:57 PM., Dallas Police 911 received a call from an anonymous caller
reporting that four Latin Males armed with weapons were dragging a black male whose hands were tied
up into a residence located at 5316 Bourquin St. Responding Officers Rowden, Begin and Bromely
arrived at the scene and based on the comments of the call, they surrounded the residence and
attempted to make contact with the occupants of the residence. The officers were able to hear yelling
and a lot of movement coming from within the residence. It's then the officers made their presence
known by shouting "Police, Police". The officers continued to hear the people inside and at one point
they heard an occupant shout an expletive towards them. They also heard something that sounded
like someone was struggling. A decision was made to push the A/C Unit that was located on the
driveway side into the residence from the outside to get a better look at what was going on,
considering that the officers were possibly dealing with a kidnapping victim. Officer Rowden observed
four black males running through the residence going towards the back. At the same time, he
observed a handgun on the table and drugs that were in plain view. Officer Rowden stated that one of
the black males picked up the gun as he fled to the back but, was unsure which suspect picked up the
gun. He informed the other officers of the actions of the suspect. They then heard glass break at the
rear of the house. As they ran to the back they observed four black males jumping out of the rear of
the residence. All four jumped a 4 foot chain link fence and continued to flee on foot. Officers Begin
and Rowden pursued the four suspects to the rear of the residence as they attempted to jump over a
second fence. Officer Begin was able to apprehend one of the four who was identified as Arthur Dixon.
Dixon surrendered to Officer Begin without a struggle and was handcuffed, while Officer Rowden
pursued the other suspects.*

*Officer Rowden was able to grab the second suspect, later identified as James Harper, as he was in*

*the process of following the events of a crime scene when a suspect resists officer commands to submit to arrest.*
*This was the first of three physical encounters that Officer Rowden and Harper had throughout this*
*incident. Officer Rowden continued to pursue Harper and was able to catch up to him in the horse*
*corral at the residence located at 3808 Mural St. As Officer Rowden pursued Harper, he observed*
*Harper grabbing at something in his front pants pocket and was able to corner him at the end of the*
*horse stables. Officer Rowden stated he gave loud verbal commands to Harper directing him to show*
*his hands and stop running. Harper, refusing to surrender, turned towards the officer and approached*
*him while he still had his hands in his front pocket. This is when Harper and Officer Rowden became*
*involved in the second physical confrontation. During the course of this confrontation Officer Rowden*
*holstered his weapon and attempted to straddle and handcuff Harper. Because of his strength,*
*Harper was able to throw Officer Rowden off as he continued to resist and fight with him.*

During the course of struggling with Harper, Officer Rowden lost his handcuffs, which fell to the
ground. Harper continued to resist and flee with Officer Rowden behind him. Officer Rowden drew his
pistol and continued to give Harper loud commands to show his hands, because Harper continued to
grab at something that was in his right front pants pocket. Officer Rowden was able to grab Harper
once again and was drug to the corner of the corral as he was holding on to Harper. Harper lost his
balance and fell to the ground landing in a sitting position facing Officer Rowden. Officer Rowden then
observed Harper reach into the same pants pocket. Officer Rowden reached over and grabbed
Harper's hand in an attempt to keep him from pulling the object out. Harper screamed an expletive at
the officer. Officer Rowden, feeling fatigued and losing control of Harper felt a hard object in the same
place where Harper had placed his hand. Believing that the object was a weapon, Officer Rowden
then disengaged, and as he was pulling back away from Harper, fearing for his life, Officer Rowden
fired three gun shots, striking Harper in the chest and torso.

After securing a search warrant for the residence at 5316 Bourquin, detectives requested the
assistance of the Narcotics Division to search and recover any narcotics that could be found.
Narcotics detective found the following:

- 19.0 grams of cocaine found on the drive way of the house next door.

The following was found inside the house at 5316 Bourquin.

- 171 grams of Marijuana
- 24.1 grams of Xanex
- 52.1 grams of Hydrocodone
- 30.1 grams of Cocaine
- 16.1 grams PCP - 38 Vials
- 9 Cell phones
- 4 Digital scales
- A Ledger
- 1 9mm Lugar semi auto
- 1 12gauge Mossberg Shotgun

As the investigation unfolded detectives were able to identify the two other suspects that had fled on
foot to avoid apprehension. Detectives also began to follow up on the anonymous caller of the false
kidnapping 911 call. Utilizing the cell number that was recorded on the 911 system, detectives
identified the carrier of the number and through cell phone records and other documents; the caller
was identified as being a person by the nick name Hotboy. Detectives also learned the number that
was logged on the 911 system was changed two hours after the shooting and in-store video was
obtained of the person who was believed to be Hotboy.

On July 26th, detectives were able to direct members of the Gang Unit to the location of one of the
remaining two suspects who was identified as Joseph Fullwood, aka Black. Detectives learned of his
whereabouts through interviews and an anonymous tip. The fourth suspect was also identified, but
remains at large at this time. The Gang Unit is aware of the identity of this suspect and is actively

pursuing him. Case 3:13-cv-04106-B   Document 66   Filed 11/03/14   Page 40 of 58   PageID 730

On July 28th, detectives received information pertaining to Hotboy via an anonymous tip. This information was followed up and they were able to locate witnesses that knew Hotboy by his true name of Keenan Johnson, as well as provide information about his involvement. That afternoon, detectives received a call from a person who identified himself as Keenan Johnson and confirmed that his nickname was Hotboy. Detectives spoke to Keenan over the phone and advised him of the investigation. Keenan Johnson came to Police Headquarters and was interviewed. Through the course of the interview, detectives were able to establish and confirm that a physical confrontation between James Harper and Keenan Johnson had taken place prior to the false kidnapping call being made. Detectives observed that Keenan Johnson had redness and hemorrhaging to both of his eyes as a result of being choked by Harper and another unidentified individual. He also sustained a large abrasion to his buttocks as a result of them dragging him out of the house where the assault took place.

*Detectives also confirmed through DPD Gang records that Keenan Johnson is a member of the Criminal Street Gang 415 BLOODS of East Dallas Posse. Detectives also learned though interviews and James Harper's tattoos that he and Arthur Dixon were both members of 357 Dixon CRIPS. Detectives could not confirm through Gang database if Fullwood is associated with Harper's group."*

### New Policies and Directives for DPD

Additionally, the department released new policies and strategic directives in relation to the shooting case. Those directives are included below:

#### 1.Formalize a process of concurrent investigative review with the FBI Civil Rights Office of all officer involved shootings

This step will help reassure the public that the Dallas Police Department is conducting a detailed and comprehensive investigation and that the findings are based upon facts uncovered by the investigation. The Police Department has requested the FBI to conduct this type of review on several occasions, the most recent of which is the James Harper shooting.

#### 2.Implement a more comprehensive Response to Resistance reporting system

A Response to Resistance report details the actions a suspect took against an officer and the steps an officer was required to take to overcome this resistance. A comprehensive reporting system will allow for a more detailed analysis of incidents involving violence against officers and their response. Information gained will assist in developing and refining tactics, training and policy. The report will also provide public transparency regarding the amount of force officers take in the performance of their duties.

#### 3.Develop a foot pursuit policy

A formalized foot pursuit policy enhances officer safety by providing officers with a foundation on which to make decisions during these high risk activities with the intent of reducing hazardous consequences and preventing, when possible, the escalation of enforcement action into lethal force confrontations.

#### 4.Re-implement the Digital Video Recorder (DVR) Review Team

The DVR Team had been temporarily inactive while a panel of Police Deputy Chiefs reviewed the proper role for the Team. The dash cam video reviews conducted by this team can serve as a training tool for the Department while building public confidence that the Department proactively examines officer performance to ensure compliance with departmental and public expectations.

#### 5.Implement a mandatory electronic control weapon (Taser) training policy for all officers

Currently, all officers that are trained with an electronic control weapon are required to carry one if available.

#### 6.Enhance the Department's consensual search policy to include the requirement for a written and/or recorded consent

Case 3:13-cv-04106-B Document 66 Filed 11/03/14 Page 41 of 58 PageID 731

Implementing this step will create greater public confidence in the consensual searches performed by
Dallas Police Officers, protect officers against false allegations of illegal search and bolster court
cases where the search is critical to proving the charge.

## 7.Research best practices that have come from critical incidents or institutional failures in public safety from around the nation

In recent years several major city police departments have been placed under consent decrees. The
Dallas Police Department proposes to research the positive practices and policies that have been
developed as a response to these failures as a way to improve our own training, policy, officer safety
and service delivery. Included in this step will be a review of the recommendations stemming from the
1988 Congressional Hearings that occurred in Dallas.

## 8.Assemble a special Community Policing Strategic Team of officers for the Dixon Circle community

*This step will create a special team of officers responsible for addressing chronic crime and
underlying quality of life issues present in the Dixon Avenue community while opening sustainable
communications with this neighborhood to build trust between the residents and the Police
Department. The Police Athletic League will play a vital role in this team effort to provide constructive
alternatives for youth in the area. If successful, this concept will serve as a model for effecting
positive change in other communities with similar crime and quality of life issues. "*

**Find this article at:**
http://www.nbcdfw.com/news/local/Dallas-Police-Release-Synopsis-of-James-Harper-Shooting-165775796.html

☐ Check the box to include the list of links referenced in the article.

© NBC Universal, Inc. | All Rights Reserved.

# EXHIBIT G

**NBCDFW.com**



# Dallas Cop Indicted for Shooting Mentally Ill Man

Monday, May 5, 2014  |  Updated 10:44 AM CDT



NBCDFW.com

An indictment accuses a Dallas police officer of aggravated assault by a public servant, the second time in two weeks that city officers have been formally charged for shootings.

Cardan Spencer was indicted after a south Dallas resident's surveillance camera showed him in October shooting a 52-year-old man standing several feet away from him.

- **Charges Dropped Against Mentally Ill Man Shot By Dallas Officer**

- **Officer Who Shot Mentally Ill Man Fired; Grand Jury to Hear Case**

The video contradicted a police report filed in the case that said Spencer shot Bobby Gerald Bennett only after Bennett lunged at him.

Bennett was wounded and hospitalized for several weeks. Spencer was indicted Thursday.

Former officer Amy Wilburn was indicted in the December shooting of a resident also caught on tape.

- **Former Officer indicted in Shooting of Unarmed Teen**

- **Dallas Mothers Critique Police for Oversights in Officer-Involved Shootings**

Police union leader Ron Pinkston said the indictments are a bad signal to send to officers dealing with potentially life-threatening situations.

Copyright Associated Press

**Find this article at:** Case 3:13-cv-04106-B   Document 66   Filed 11/03/14   Page 44 of 58   PageID 734
http://w w w .nbcdfw .com/new s/local/Dallas-Cop-Indicted-for-Shooting-Mentally-Ill-Man-257953891.html

☐ Check the box to include the list of links referenced in the article.

© NBC Universal, Inc. | All Rights Reserved.

 



Powered by *The Dallas Morning News*

# Trainers question tactics in police shooting of mentally ill man

    99      15      0    8+ Share   12      26   AA ▲ ▼

By TANYA EISERER
Staff Writer
teiserer@dallasnews.com
Published: 21 October 2013 11:13 PM
Updated: 22 October 2013 09:35 AM

A Dallas police officer who appeared in a surveillance video to have unnecessarily shot a mentally ill man violated several basic tactical rules, several law enforcement experts say.

The experts made their comments after viewing a video taken by a neighbor when Bobby Gerald Bennett, 52, was shot last week.

But another law enforcement training expert said it's too early to draw conclusions from the video, which is a two-dimensional representation of a three-dimensional situation.

Dallas police officials did not comment on the shooting Monday, citing an ongoing investigation.

Former Dallas police training Sgt. Keith Wenzel, who retired from the force in April, said what Officer Cardan Spencer did "in 27 seconds was absolutely against all training, all policies for dealing with the mentally ill."

"The officer's actions don't reflect the training that I know that Dallas police officers have received," Wenzel said.

Wenzel and another veteran law enforcement trainer said that nothing about Bennett's actions appears to justify the Oct. 14 shooting. The video shows Bennett standing still with his arms at his side when Spencer opens fire. Police have said Bennett had a knife in his hand.

"I don't think you've got a rogue cop who wants to kill someone," said Jim Glennon, a former Chicago-area police homicide task force commander who teaches street survival classes to law officers across the country.

"What you have is a police officer who overreacted. The stress overwhelmed him quickly. If the stress hits you that bad, your muscles tighten up and your finger is on the trigger. Literally, he could have fired off that first shot by accident."

One week after the shooting, Bennett remains in a Dallas hospital after being shot in the abdomen outside his home in the southeast Dallas neighborhood of Rylie. An aggravated assault charge against him has been dropped.

Spencer is on indefinite administrative leave. His partner, Officer Christopher Watson, didn't fire his gun and wasn't placed on leave.

Spencer's attorney, Robert Rogers, has defended him, saying that the "facts and circumstances known to Officer Spencer at the time completely justify his actions."

Police Chief David Brown has not spoken publicly about the shooting, and he declined to comment on it Monday evening after an unrelated town hall meeting.

Authorities have said that Spencer and Watson were dispatched to the 9400 block of Crimnson Court after Bennett's mother, Joyce Jackson, called police for help in dealing with her son.

Police have said that she told the 911 operator Bennett was violent, had a knife and wanted the cops to kill him.

According to court documents, Spencer shot Bennett after he walked toward him and his partner with a "knife raised in an aggressive manner." Spencer fired his weapon four times, striking Bennett in the abdomen.

6/5/2014                    Trainers question tactics in police shooting of mentally ill man | Dallas Morning News

manner. Oper Case 3:13-cv-04106-B Document 66 Filed 11/03/14 Page 46 of 58 PageID 736

But the neighbor's surveillance video contradicts that account.

On the video, Bennett, who was sitting in a chair, initially rolls back from the officers as they advance on him. He then stands up but does not move. His hands remain at his side and he is standing still when Spencer shoots him.

The video shows that 27 seconds elapsed from the time the officers pulled up in their squad car to when Spencer opened fire.

The Dallas shooting comes as law enforcement officers across the nation have come under criticism for deadly force confrontations involving the mentally ill.

When dealing with the mentally ill, Wenzel said, a supervisor should also respond to the scene as the "voice of calm." He said the incident points to a need for more and better training for officers dealing with the mentally ill.

"With the mentally ill, you've got to respect their sickness," Wenzel said.

Wenzel and Glennon said the officers should not have continued to advance on Bennett after he complied with their order to stand still.

"They're taught to defuse," said Wenzel. "You don't escalate the situation."

Wenzel says that even if Bennett had said he wanted to kill the officers or someone else, that is not enough to justify using deadly force against a suspect holding a knife.

Glennon said that when he watched the video, he kept waiting for Bennett to make an overt aggressive move that would have justified the officer's firing his weapon.

"The guy didn't do anything except stand up," Glennon said. "If he thought he was that much of a threat when he stood up, that's when he should have shot him, but you've got a five-second delay before he fired."

Glennon said he's left with a lot of questions: What did the officers know at the time? What did Bennett say when the officers confronted him?

"If the officers are told that he wants a police officer to shoot him and he's willing to do anything to get shot, well now the officer is going to be going there with a real heightened awareness," Glennon said. "He's thinking that it's either me or him. That could cause somewhat of an overreaction."

Harvey Hedden, executive director of the International Law Enforcement Educators and Trainers Association, agreed with Glennon and Wenzel that the officers should have maintained their distance from Bennett.

But Hedden cautioned against drawing conclusions from the video, which was shot from a vantage point behind Bennett, making it impossible to see Bennett's body language or expression, he said.

"It is unfortunately a very limited perspective," Hedden said. "Obviously, the fact that this tape shows that this guy doesn't appear to be moving is the reason why people are calling for an investigation."

Wenzel, however, believes the video tells enough of the story of what happened on Crimnson Court.

"You can't justify what the officer did. If anybody does, all they're trying to do is try to prepare themselves for making sense of a horrible, horrible tactical error," he said. "Good cops will say, 'I don't want to be critical,'" Wenzel said. "When will good cops ultimately be critical of other police officers who don't perform according to standards?"

Staff writer Tristan Hallman contributed to this report.

Did you see something wrong in this story, or something missing? Let us know.

---

You Might Also Like

   

# EXHIBIT H





Powered by *The Dallas Morning News*

# Ex-Dallas officer indicted in shooting of unarmed man

14     3     0    8+ Share 1    AA ▲ ▼

By TRISTAN HALLMAN
Staff Writer
thallman@dallasnews.com
Published: 24 April 2014 11:14 PM
Updated: 25 April 2014 08:57 AM

For the first time in four decades, a Dallas County grand jury has indicted a Dallas police officer in connection with an on-duty police shooting.

Former Senior Cpl. Amy Wilburn was indicted in the shooting of an unarmed man late last year. She is believed to be the first Dallas officer to face charges in a police shooting since Officer Darrell Cain was indicted in the 1973 fatal shooting of 12-year-old Santos Rodriguez. Cain was convicted of murder and sentenced to five years in prison.

Wilburn could also serve prison time as she faces an aggravated assault charge — a first-degree felony — for the Dec. 9 shooting of Kelvion Walker, 19. She was fired by Chief David Brown soon after the shooting.

In Wilburn's case, police have said she and another officer had been chasing a car that had been stolen earlier that day during an allegedly violent carjacking. The car pulled around a corner and into an apartment complex in the 9500 block of Military Parkway in Pleasant Grove.

A police cruiser's dash cam video showed the driver — who police say was Walker's high school classmate Reginald Robertson — jumping out of the car and running away.

Wilburn's partner pursued Robertson. He was arrested about a week later. Wilburn ran to the car, which was still in gear and rolling toward an apartment building, and opened the driver door. She saw Walker in the passenger seat, pulled her gun and fired one shot.

The video does not show what Walker was doing at the time he was shot.

Wilburn's attorney has said she told police investigators that she had demanded to see Walker's hands, that he didn't appear to comply

and that she feared he was reaching for a gun.

But Walker and an independent witness, a real estate agent who was sitting in a car facing the action, told reporters and internal investigators that Walker had his hands in the air and was trying to surrender at the time.

Walker and his attorney, Geoff Henley, filed a federal lawsuit against Wilburn in mid-December. Attorneys in the case are currently going through the discovery process.

Henley said Walker, who was hit in the abdomen, is recovering but still has the bullet inside of him and suffers myriad health issues because of the shooting. A friend, Melvin Donnell, said in a jailhouse interview with *The Dallas Morning News* that Walker nearly died from his injuries.

Henley welcomed the indictment, saying that "it's obvious that the grand jury sees the same things that we do."

"And like the grand jury, we want to see that justice is done in both the civil and the criminal process," he said.

Walker was never charged in connection with the Dec. 9 carjacking and denied knowing that the car was stolen.

Case 3:13-cv-04106-B Document 66 Filed 11/03/14 Page 49 of 58 PageID 739

Internal police shooting investigations often take months to complete, but Brown terminated Wilburn on Dec. 30. The department released a statement after the firing stating that it was clear that Wilburn violated the department's deadly force policy and failed to abide by tactical protocol before, during and after the shooting.

The entire incident happened within seconds, and the witness was driving slowly in reverse just before Wilburn pulled her gun. Brown's seemingly quick decision left some officers fuming about the treatment Wilburn received.

The shooting was the second controversial Dallas police shooting in two months. Officer Cardan Spencer was also fired weeks after he shot Bobby Bennett, a mentally ill Rylie man, on Oct. 14.

Bennett was holding a knife but was standing still in a cul-de-sac with his arms at his sides when he was shot. Bennett was initially charged with aggravated assault, but the charge was dropped after a neighbor's video showed Spencer's partner's account of the incident did not match what happened.

Spencer's case is set to be heard by a grand jury Tuesday.

Did you see something wrong in this story, or something missing? Let us know.

---

You Might Also Like









There's a New Top Dishwasher On the Market
(Consumer Reports)

Buying vs Renting: The Real Facts
(YouTube)

The 10 Most Hated U.S. Presidents in History
(Answers.com)

Don't keep that mortgage payment
(Bills.com)

Recommended by

### From the web

Medicaid Expansion Plans Provide Novel Approaches for Healthcare Coverage OncLive

Nicole Curtis: The Rehab Addict DIY Network

Cutting Landon Donovan Lost Sponsors for World Cup TheStreet

### More from *Dallasnews.com*

Dallas police detective Ken Penrod dies at 55 Obituaries

Surveillance of suspected drug house nets big meth bust, two arrests for Dallas police Crime Blog

Nebraska woman eats 2 72-ounce steaks in 15 minutes in Amarillo News

Recommended by

## Comments

To post a comment, log into your chosen social network and then add your comment below. Your comments are subject to our Terms of Service and the privacy policy and terms of service of your social network. If you do not want to comment with a social network, please consider writing a letter to the editor.

Write a comment

**0 Comments**

Sort Subscribe RSS

# EXHIBIT I

**NBCDFW.com**



PRINT THIS

Powered by  Limelight

HOME > NEWS > LOCAL

# Dallas Police Leaders Oppose Use of Force Training Plan

By Ken Kalthoff | Tuesday, Jan 14, 2014 | Updated 9:41 AM CDT



Ken Kalthoff, NBC 5 News

Dallas Police Chief David O. Brown publicly discussed plans for officer training for the use of deadly force after several controversial police-involved shootings. The plan discusses at a city council meeting does not sit well with some officer groups.

#endcardShareBtns div.gig-button-container-facebook-like .fb-like span, #endcardShareBtns div.gig-button-container-facebook-like .fb-like span iframe {vertical-align:top!important;}

Dallas police leaders warned Monday that Chief David Brown's new "Use of Force" training plan

could actually reduce public safety.

Brown and his top commanders spoke publicly about the plan Monday at a Dallas City Council Public Safety Committee meeting.

It comes after more than two dozen officer-involved shootings the past two years, many of them fatal.

"Our goal is to improve citizen and officer safety. We want to improve and continue to improve the public's trust and confidence in the department," Deputy Chief Albert Martinez said.

The plan would increase use of deadly force training for every officer from every two years to every two months.

"It's sea change in training for our department and there are trade offs because when you're training you're not working on the streets of Dallas," Brown said.

Leaders of the Dallas Police Association and Dallas Fraternal Order of Police both said they support additional training time but take issue with other parts of the plan.

Sergeants will take over many training slots from regular officers and senior corporals with a goal of adding supervisor-level authority.

"The people that are there are doing an excellent job. The problem is that they think they need to get in there with management to water it down," said Richard Todd, president of the Dallas FOP.

Case 3:13-cv-04106-B a Document 66 Filed 11/03/14    Page 52 of 58   PageID 742

After a shooting involving an off-duty officer in a Dallas neighborhood,
neighborhood, a policy change now forbids single officers from chasing suspected criminals alone on foot.

Todd said that policy, and the training changes, have officers wondering what is allowed.

"They're going to be so worried about whether they're going to get in trouble that they're not going to react. They need to know about what levels of force they can use and when they should act," Todd said.

Another new Dallas program is adding body video recorders which some other police departments use the make a video record of what officers see.

Dallas Police Association President Ron Pinkston said body cameras could help officers defend themselves from unjust accusations.

"We want to make sure that the policy that regulates them isn't a punitive policy and the privacy rights of the officers aren't violated while they are driving along talking to each other during the day," Pinkston said.

Councilman Phillip Kingston agreed.

"Our officers have to feel that this is a tool to protect them rather than some sort of gotcha," Kingston said.

The programs to improve public confidence in police officers actions come as Dallas police report very good crime fighting results.

in 2013, for the 10th straight year overall crime went down in the City of Dallas. The city is now 6th among the top 10 US cities in crime rate instead of tenth where it was in 2003.

"This is a wonderful achievement," said Councilwoman Sandy Greyson said.

Brown denied it is the result of underreporting real crime.

"No big city has done it better than Dallas over the last decade. Dallas is best-in-class reducing crime more than any other big city in the country during this period," Brown said.

Council members challenge police to do even better.

"Where we are celebrating today. I would like for us to knock it down, down and down," said Councilman Dwaine Caraway.

Sexual assault was the only crime category to rise by double digits in the 2013 numbers. It rose 12.96 percent.

 Brown warned that a sexual assault nurse examiner program expanding to more Dallas hospitals in 2014 could increase reporting of that crime.

"We expect that victims will feel more comfortable reporting. As more victims report, more DNA will be put in the national databank of these perpetrators and more people will be brought to justice, whereas under reporting makes it more difficult to hold perpetrators responsible," Brown said.

Brown plans to implement the new use of force training plan by this fall.

**Find this article at:**
http://www.nbcdfw.com/news/local/Dallas-Police-Leaders-Oppose-Use-of-Force-Training-Plan-240023771.html

☐ Check the box to include the list of links referenced in the article.

© NBC Universal, Inc. | All Rights Reserved.

EXHIBIT J

**NBCDFW.com**



PRINTTHIS
Powered by   Limelight

HOME > NEWS > LOCAL

# Dallas Mothers Critique Police for Oversights in Officer-Involved Shootings

By Randy McIlwain | Friday, Dec 13, 2013 | Updated 9:57 AM CDT



Mothers Against Police Brutality

Randy McIlwain, NBC 5 News

Dallas Police and the Dallas District attorney are facing criticism tonight. A group of Dallas mothers claim police are using deadly force in too many instances against minorities and they want someone to police the police.

#endcardShareBtns div.gig-button-container-facebook-like .fb-like span, #endcardShareBtns div.gig-button-container-facebook-like .fb-like span iframe {vertical-align:top!important;}

Mother's Against Police Brutality critiqued Dallas police and the Dallas County District Attorney's office for what they call lax oversight in officer-involved shootings.

The newly formed group came out swinging in its first-ever news conference with a stinging evaulation of the Dallas Police Department and the district attorney's office for its handing of officer-involved shootings.

"It's not a black problem, it's not a Hispanic problem, it is not a poor people's problem, it's our problem," said Collette Flanagan, the founder of the Dallas group and who's unarmed son, Clinton Allen, was fatally shot last March by a Dallas police officer.

Flanagan was joined by other mothers who have lost sons in officer-involved shootings as well as local civil rights activists.

They group supported its critique with studies of the Dallas Police Departments own data indicating that the overwhelming number of citizens shot by Dallas officers were black and Hispanic males.

The numbers showed that the number of officer-involved shootings in Dallas was 11 percent higher than the national rate.

"Over 60 unarmed men have been killed by Dallas policemen since 2001 with only one indictment to date," said Flanagan.

The case Flanagan referred to was the October shooting of Bobby Bennett, a mentally ill man who was shot by a Dallas officer. The officer has since been fired for policy violations related to his

response to the Bennett shooting went viral.

Initially, Bennett was charged with aggravated assault. An officer on scene gave sworn testimony that Bennett had made an aggressive move that prompted the use of deadly force.

Bennett is still recovering from his injury but the entire incident was videotaped by a neighbor's surveillance camera and completely contradicted the officer's account. That officer received a suspension of 15 days and caused Dallas police to change its policy for reporting officer-involved shootings.

Under the new policy, DPD officers have 72 hours and access to investigative evidence in an officer-involved shooting before making an official sworn statement about what happened.

Flanagan says that policy encourages officers to lie.

"Seventy-two hours to view any visible video footage and to have access to internal affairs reports before making official statements is sinister, unconstitutional and unethical," said Flanagan.

The Dallas Police Department indicated they would respond in a written statement to the criticisms of the policy and allegations that they can't be trusted to regulate their own officers.

Dallas Police Chief David Brown released a message in response to the recommentations made by Mother's Against Police Brutality:

*"I share many of their concerns and agree on a number of the recommendations that were brought forth. I look forward to working with this group, and moving forward towards positive changes for our department."*

The office of District Attorney Craig Watkins said that grand jury decisions to not indict officers in cases of force of deadly force are thorough investigations where all available evidence is presented.

Watkins said his office is asking the Dallas County Commissioners Court for $500,000 to fund a civil rights unit.

The unit would have the specific responsibility of investigating cases of officer involved shootings and having investigators on the ground in the moments after a shooting has occurred to gather evidence independently, instead of relying on police reports and investigators.

**Find this article at:**
http://www.nbcdfw.com/news/local/Dallas-Mothers-Critique-Police-for-Lacked-Regulation-of-Officer-Involved-Shootings-235673801.html

☐ Check the box to include the list of links referenced in the article.

© NBC Universal, Inc. | All Rights Reserved.

# EXHIBIT K





**neighborsgo**      **BEST SOUTHWEST**      **86°**

Powered by *The Dallas Morning News*          FORECAST    TRAFFIC

ALL COMMUNITIES    LOCAL NEWS    WEATHER

## Craig Watkins says he still has big plans for DA's office

✉   27     9     1    8+ Share   7    AA ▲ ▼

By TRISTAN HALLMAN
Staff Writer
thallman@dallasnews.com
Published: 14 November 2013 11:48 PM
Updated: 14 November 2013 11:48 PM

LANCASTER — Dallas County District Attorney Craig Watkins has gained a national reputation for spearheading prisoner exonerations.

As he prepares to seek a third term, Watkins said Thursday he wants to expand on that role and add a few others.

Watkins said he would like to conduct deeper investigations into shootings involving officers, give second chances to criminals who have served their time and left crime behind, and push for even more exonerations.

In a speech billed as the State of the District Attorney's Office address, Watkins told about 50 people at a Lancaster Chamber of Commerce luncheon that his first two terms have focused mainly on "getting things fixed."

Watkins, a Democrat who was first elected in 2006, gained attention for using DNA tests to overturn convictions, and he said his office has a few more such cases pending.

When prosecutors finish with those next year, Watkins said, he wants his team to take another look at people convicted of arson and those accused of shaking their babies to death. Watkins said he has concerns about the science used in the prosecution of both types of cases.

"The science has changed. We need to revisit it," Watkins said without elaborating.

Watkins also said that in 2015, he will ask the Legislature to allow nonviolent felons — such as those convicted of drug or theft offenses — to erase their criminal histories if they stay out of trouble for 10 years. That way, the offenders can get jobs and reintegrate into society, he said.

At the same time, Watkins touted a conviction rate of 99 percent since he took office. He said he wants to broaden his reach in areas such as white-collar crime and mortgage fraud.

Earlier this year, Watkins was accused of trying to help a political ally by seeking to indict Al Hill III, a wealthy oil heir, on mortgage fraud charges. Watkins was held in contempt of court after he refused to testify about the allegations.

The fraud charges were dismissed, and Watkins was acquitted of contempt. The district attorney's office is appealing the dismissal of the charges against Hill.

Referring to the investigation of police shootings, Watkins reiterated his support for having his office investigate such cases rather than leaving the inquiries up to the affected police departments.

"There have been so many times when we have seen law enforcement fail us," he said.

He said the district attorney's office investigated the case of Garland police Officer Patrick Tuter, who fired at a fleeing suspect 41 times, killing him, in August 2012. Tuter was indicted Monday on manslaughter charges. He was the first officer involved in a fatal shooting in Dallas County to be indicted in more than 15 years.

Watkins said his office has also been investigating Dallas police Officer Cardan Spencer's shooting of a mentally ill Dallas Rylie. Police Chief David Brown fired Spencer after a neighbor's surveillance video contradicting the official account was made public. The video showed the man, who had a knife, standing still with his hands at his sides.

Spencer's case has yet to go before a grand jury.

Watkins said he will ask the Dallas County Commissioners Court for about $500,000 next year to add investigators who can go to the scene of police shootings immediately.

Dallas Police Association president Ron Pinkston said he strongly opposes that plan, which he called a political ploy. He said independent investigations should be handled by the FBI or other agencies that he says are insulated from politics.

Watkins said the luncheon was the first stop in a tour to explain what the district attorney does but said it was not part of his re-election campaign. He said he got the idea from Brown, who regularly hosts Chief on the Beat events throughout the city to meet residents.

"I've gotten to go all over the country talking about Dallas and what we do in Dallas," Watkins said. "And it's time for me to spend some time in Dallas and explain to citizens of Dallas what we do."

Watkins got a standing ovation before the speech and took questions from the audience of business leaders and public officials afterward.

"A lot of people in the county think that all the DA does is put people in jail," said Monroe Mayes, 72, a sales representative for Cedar Valley College. "But that's not it. I really enjoyed his message today."

Did you see something wrong in this story, or something missing? Let us know.

## You Might Also Like



Don't Throw Out Those Eggshells!
(AARP)



There's a New Top Dishwasher On the Market
(Consumer Reports)



The 7 Secret Habits of Navy SEALs
(Inc.com)



Don't keep that mortgage payment
(Bills.com)

Recommended by

### From the web

GM to Provide Ignition Switch Recall Update FastLane

10 Colleges That Produce the Most Millionaires Worthly

The 10 Most Hated U.S. Presidents in History Answers.com

### More from *Dallasnews.com*

Update: Police say 36-year-old doctor fondled 14-year-old girl, bought her lingerie Crime Blog

Dallas County grand jury declines to indict two men on capital murder charges in February slayings Crime Blog

Soldiers claim search for Sgt. Bowe Bergdahl caused deaths, but facts are murky News

Recommended by

## Comments

To post a comment, log into your chosen social network and then add your comment below. Your comments are subject to our Terms of Service and the privacy policy and terms of service of your social network. If you do not want to comment with a social network, please consider writing a letter to the editor.

Write a comment

0 Comments                                                                    Sort  Subscribe  RSS